2006-NMCA-063

136 P.3d 1029

Nora PIÑA Individually and as Temporary Administratrix of the Estate of Daniel H. Piña, Deceased, and as Next Friend of Santiago Piña, Daniel A. Piña, and Daniel Ray Piña, Plaintiffs,

and

Banta Oilfield Services, Inc., Plaintiff in Intervention–Appellee,

Bituminous Insurance Companies, Plaintiff in Intervention–Appellee,

v.

GRUY PETROLEUM MANAGEMENT COMPANY, Defendant–Appellant,

National Union Fire Insurance Company of Pittsburgh, PA, Intervenor–Appellant.

Nos. 25,219, 24,960.

Court of Appeals of New Mexico.

April 12, 2006.

Beall & Biehler, Larry D. Beall, José R. Blanton, Albuquerque, NM, for Appellee Banta Oilfield Services.

Keleher & McLeod, PA, Robert C. Conklin, Thomas C. Bird, Benjamin F. Feuchter, Albuquerque, NM, for Appellee Bituminous Insurance Companies.

Rodey, Dickason, Sloan, Akin & Robb, PA, Edward Ricco, Albuquerque, NM, Strasburger & Price, LLP, Jack M. Murchison, Houston, TX, Andrews Kurth, LLP, Stuart C. Hollimon, Dallas, TX, for Appellants Gruy Petroleum Management Co. and National Union Fire Ins. Co. of Pittsburgh, PA.

## OPINION

ALARID, Judge.

{1} This case turns upon the interpretation of NMSA 1978, § 56–7–2 (1999), commonly known as the Oilfield Anti–Indemnity Statute. We hold that Section 56–7–2, as amended in 1999, is an expression of a "fundamental principle of justice," which is to insure the safety of persons and property at well sites within New Mexico, and that a choice of law provision applying Texas law, by which an indemnitee may be indemnified against its own negligence, is void as violative of the public policy of New Mexico. Recognizing that previously we may have underestimated the force of the public policy expressed by Section 56–7–2, we limit our decision in *Reagan v. McGee Drilling Corp.*, 1997–NMCA–014, 123 N.M. 68, 933 P.2d 867, to the pre–1999 version of Section 56–7–2.

## BACKGROUND

{2} Appellant, Gruy Petroleum Management Co. (Gruy), is a Texas Corporation. Appellee, Banta Oilfield Services, Inc. (Banta), is a New Mexico Corporation. Appellee, Bituminous Insurance Companies (Bituminous), is a foreign insurer authorized to conduct business in New Mexico.

{3} In July 2000, Banta and Gruy entered into a Master Service Contract (MSC) under which Banta agreed to perform work at an oil well site operated by Gruy in Lea County, New Mexico. Article 10 of the MSC provided that

[t]o the fullest extent permitted by law, [Banta] shall indemnify, defend and hold harmless GRUY ... from and against all claims, damages, losses, liens, causes of action, suits, judgments, fines and expenses, including, but not limited to rea-

sonable attorneys' fees (collectively referred to and defined as "Liabilities"), of any person or entity arising out of, caused by or resulting directly or indirectly from the performance of the work under this Contract, ... regardless of whether the Liabilities are caused in part by the negligence of any Indemnitee.

Article 11 of the MSC required Banta to maintain a $1,000,000 commercial general liability policy adding Gruy as an "additional insured" and to waive any rights of subrogation that Banta and its insurer otherwise would have against Gruy. Article 24 of the MSC provided that it "shall be construed and interpreted in accordance with the laws of the state of Texas." Gruy drafted the MSC and signed it in Texas; Banta signed the MSC in New Mexico.[1]

{4} Banta purchased liability insurance from Bituminous. The policy insured Banta against tort liability assumed by contract and named Gruy as an additional insured.

{5} In March 2003, Nora Piña filed a wrongful death action against Gruy, alleging that her husband, Daniel, suffered fatal burns in 2002 while employed by Banta at a well site located in Lea County, New Mexico, and owned and operated by Gruy. Piña alleged that her husband's injuries were caused by the wrongful conduct of Gruy's agents or employees. Piña sought compensatory and punitive damages.

{6} Banta intervened in the wrongful death action. Banta alleged that Gruy had invoked Article 10 of the MSC, demanding that Banta defend and indemnify Gruy. Banta sought a declaratory judgment invalidating the indemnity provision as violative of Section 56–7–2. Gruy cross-claimed against Banta, seeking enforcement of the indemnity provision and a declaratory judgment validating the provision. Banta and Gruy filed cross-motions for summary judgment. The district court granted Banta's motion and denied Gruy's motion, ruling that the indemnity provision of the MSC was against the public policy of New Mexico as expressed in "[Section] 56–7–2 (*1999*)" (emphasis added)

and therefore was "void and unenforceable." Gruy appealed.

{7} Thereafter, Bituminous intervened in the wrongful death action. Citing Section 56–7–2, Bituminous sought a declaratory judgment relieving it on grounds of public policy of any responsibility to defend or indemnify Gruy. Gruy filed a counter-claim seeking a declaratory judgment that Bituminous was required to defend and indemnify Gruy against Piña's claims. Bituminous and Gruy filed cross-motions for summary judgment. The district court granted Bituminous' motion and denied Gruy's motion. Gruy appealed.

{8} We consolidated the two appeals.

## DISCUSSION

{9} The Oilfield Anti–Indemnity Statute was enacted in 1971. 1971 N.M. Laws, ch. 205, § 1. In its original form, Section 56–7–2 [then codified as NMSA 1953, § 28–2–2] provided as follows:

A. Any agreement, covenant or promise contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water ... which purports to indemnify the indemnitee against loss or liability for damages, for:

(1) death or bodily injury to persons; or

(2) injury to property; or

(3) any other loss, damage or expense arising under either Paragraph (1) or (2) or both; or

(4) any combination of these, arising from the sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee ... is against public policy and is void and unenforceable. This provision shall not affect the validity of any insurance contract or any benefit conferred by the Workmen's Compensation Act....

{10} We construed Section 56–7–2 in *Guitard v. Gulf Oil Co.*, 100 N.M. 358, 670 P.2d 969 (Ct.App.1983). In *Guitard*, we recognized that the public policy underlying Section 56–7–2 is to promote safety. *Guitard*, *100 N.M.* at 361, 670 P.2d at 972. We construed Section 56–7–2 to permit indemnity agreements that do not purport to relieve

---

1. The order in which the parties signed the MSC   is not clear from the record.

the indemnitee from liability for its own negligence, since in the case of such agreements, "[b]oth the operator [indemnitee] and the subcontractor [indemnitor] will have incentive to monitor the safety of the operation knowing that they will be responsible for their respective percentage of negligence." *Guitard, 100 N.M.* at 362, 670 P.2d at 973. We upheld the indemnity agreement at issue in *Guitard* because we interpreted it to require the indemnitor to indemnify the indemnitee only for the indemnitor's percentage of negligence.

{11} Our Supreme Court construed Section 56–7–2 in *Amoco Production Co. v. Action Well Service, Inc.,* 107 N.M. 208, 755 P.2d 52 (1988). *Amoco* turned upon the clause "this provision shall not affect the validity of any insurance contract" contained in the final sentence of Section 56–7–2(A)(4). *Amoco Prod. Co.,* 107 N.M. at 210, 755 P.2d at 54 (internal quotation marks and citation omitted). The Supreme Court held that this language allows a party to obtain insurance against its own negligence, but that it does not permit indemnification agreements whereby the indemnitor is required to obtain insurance that insures an indemnitee from liability for the indemnitee's own negligence.

{12} Subsequently, in *Reagan,* we considered Section 56–7–2 in a conflict-of-laws context. In *Reagan,* a Texas drilling contractor sought indemnification from the Texas operator of an oil well located in Lea County, New Mexico, against liability for injuries to a third-party's employee caused by a defective platform belonging to the drilling contractor and under the drilling contractor's sole control and custody. The indemnity agreement at issue in *Reagan* provided that it was "governed and interpreted under the laws of TEXAS." *Reagan,* 1997–NMCA–014, ¶ 4, 123 N.M. 68, 933 P.2d 867. We observed that Texas' anti-indemnity statute allowed indemnity agreements indemnifying a party against its own negligence where the indemnitor's obligation is covered by liability insurance, an arrangement nevertheless unlawful under Section 56–7–2 as interpreted by our Supreme Court in *Amoco. Reagan,* 1997–NMCA–014, ¶ 11, 123 N.M. 68, 933 P.2d 867. We acknowledged that New Mexico policy of

not enforcing indemnity agreements was stricter than that of Texas and that under New Mexico law the indemnity agreement would be void and unenforceable. *Id.* ¶ 12.

{13} Examining conflict-of-laws principles, we observed that New Mexico courts may decline to enforce a choice-of-law provision in a contract incorporating foreign law if application of foreign law would offend New Mexico public policy. *Id.* ¶ 8. We immediately qualified this apparently broad public policy exception to freedom of contract:

> It is said that courts should invoke this public policy exception only in "extremely limited" circumstances. Mere differences among state laws should not be enough to invoke the public policy exception. Otherwise, since every law is an expression of a state's public policy, the forum law would always prevail unless the foreign law were identical, and the exception would swallow the rule. The threshold, under Justice Cardozo's classic articulation, is whether giving effect to another state's policies would "violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal" of the forum state.

*Id.* ¶ 9 (citations omitted). We concluded that the diametrically opposed outcomes that would obtain under New Mexico law versus Texas law merely established that the laws of the two states are "different" and that application of Texas law to uphold an indemnity agreement that was unlawful under Section 56–7–2, as construed by our Supreme Court, would not violate "some fundamental public policy of the State of New Mexico." *Reagan,* 1997–NMCA–014, ¶ 14, 123 N.M. 68, 933 P.2d 867. Relying on public policy favoring freedom of contract, and what we perceived as the absence of a serious policy conflict between New Mexico and Texas law, we upheld the parties' choice of Texas law, which validated the indemnification provision:

> In the present case, the indemnity provisions are valid under Texas law, whose public policy is consistent with New Mexico's. Furthermore, the indemnity provisions [in the contract] do not touch upon any rule of public morals. They do not rise to the level of violating "some funda-

mental principle of justice, some prevalent conception of good morals...." The parties negotiated and signed the contract in Texas. Both parties were free to choose Texas law to govern their contract, and under that law the provisions are valid. Our conflict of laws rules require us to recognize that law and enforce the contract.

*Id.* ¶ 16 (citation omitted).

■ {14} In 1999, the Legislature substantially revised Section 56–7–2:

A. An agreement, covenant or promise contained in ... an agreement pertaining to a well for oil ... that purports to indemnify the indemnitee against loss or liability for damages arising from the circumstances specified in Paragraph[ ](1) ... is against public policy and is void:

(1) the sole or concurrent negligence of the indemnitee ...;

....

C. A provision in an insurance contract ... or any other contract requiring a waiver of rights of subrogation or otherwise having the effect of imposing a duty of indemnification on the primary insured party that would, if it were a direct or collateral agreement [indemnifying a party against its own negligence], be void, is against public policy and void.

1999 N.M. Laws, ch. 162, § 1.

{15} In 2003, the Legislature amended Section 56–7–2, inserting the words "foreign or domestic" and "within New Mexico" in Subsection A:

A. An agreement, covenant or promise, *foreign or domestic*, contained in ... an agreement pertaining to a well for oil ... *within New Mexico*, that purports to indemnify the indemnitee against loss or liability for damages arising from the circumstances specified in Paragraph (1) ... is against public policy and is void:

(1) the sole or concurrent negligence of the indemnitee ... [.]

2003 N.M. Laws, ch. 309, § 2 (emphasis added).

{16} Gruy concedes that the 2003 version of Section 56–7–2 would invalidate the indemnification provisions of the MSC. Gruy argues that

[w]hile the district court correctly recognized that the 1999 version of the statute applies to the present case and the 2003 version is not retroactive, the court in essence gave the 2003 amendment retroactive effect by erroneously ascribing to the 1999 statute a legislative intent that was not manifest until 2003.

Gruy argues that the district court's interpretation of the 1999 version of Section 56–7–2 frustrates a legitimate expectation that its indemnity agreement would be enforceable under New Mexico law.

■ {17} Section 56–7–2 is an example of an extraordinarily limited class of statutes whose very subject is the enforceability of contracts that contravene a specific public policy. In 1971, when the Legislature enacted the original version of Section 56–7–2, it was well settled that freedom of contract is a "paramount" public policy "not to be interfered with lightly." *Tharp v. Allis–Chalmers Mfg. Co.*, 42 N.M. 443, 449, 81 P.2d 703, 706 (1938). In enacting Section 56–7–2, our Legislature directly addressed the conflict between the policies generally favoring freedom of contract and the policy favoring safety at well sites and mines located in New Mexico. The Legislature expressly determined that in this particular context, freedom of contract was to be subordinated to the policies furthered by the Oilfield Anti–Indemnity Statute. Where the Legislature has directly addressed the question of unenforceability on grounds of public policy "the court is bound to carry out the legislative mandate with respect to the enforceability of the term." Restatement (Second) of Contracts § 178(2) cmt. a (1981).

{18} The Legislature's decision to expressly subordinate freedom of contract to well site safety is a persuasive indicator that the Legislature believed promoting safety at well sites to be an especially important public policy. The Legislature, which we presume was familiar with the strong public policy favoring freedom of contract, nevertheless, chose to elevate the public policy favoring safety at well sites over the public policies underlying freedom of contract. In *Reagan,*

we failed to appreciate that a public policy embodied in a statute that expressly overrides freedom of contract is necessarily an unusually important public policy in its statutory context. *See* Restatement (Second) of Conflict of Laws § 187 cmt. g (1971) (discussing public policy exception to parties' ability to contractually designate which state's law will apply to their transaction; observing that "fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal").

{19} In deciding *Reagan*, we also failed to appreciate that safety concerns underlying Section 56–7–2 are not limited to the immediate parties to an indemnity agreement. By requiring an indemnitee to remain responsible for its own negligence, Section 56–7–2 protects third parties whose person or property would be placed at risk by the indemnitee's indifference to safety.[2] Because Section 56–7–2 promotes the safety of third parties, an indemnity agreement prohibited by Section 56–7–2 is not a purely private matter.

{20} In *Reagan*, we assumed that "while a Texas indemnity contract covered by insurance is contrary to the letter of New Mexico law, it does not promote a policy at odds with New Mexico [public] policy." *Reagan*, 1997–NMCA–014, ¶ 13, 123 N.M. 68, 933 P.2d 867. Bituminous points out that the 1999 amendment to Section 56–7–2 directly responded to this observation by expressly providing in Subsection (C) that indemnity agreements covered by insurance are "against public policy and void." Subsequent to the 1999 amendment, it is no longer reasonable to state, as we did in *Reagan*, that enforcement of an indemnity agreement indemnifying the indemnitee against its own negligence supported by insurance "does not promote a policy at odds with New Mexico policy." 1997–NMCA–014, ¶ 13, 123 N.M. 68, 933 P.2d 867. By expressly declaring that prohibited indemnity agreements covered by insurance also are "against public policy," the 1999 amendment severely undercut our analysis in *Reagan*, which proceeded on the assumption

that the choice-of-law clause at issue implicated "mere differences" between New Mexico and Texas law.

{21} We hold that the Texas anti-indemnity statute is fundamentally inconsistent with important New Mexico public policy as expressed in Section 56–7–2 *as amended in 1999*. Accordingly, a choice-of-law provision contained in a contract executed subsequent to the effective date of Section 56–7–2 as amended by the 1999 Legislature and that purports to apply Texas' anti-indemnity statute to validate an otherwise prohibited indemnification agreement pertaining to work to be performed at a New Mexico oil well site is itself void as against public policy.

 {22} "[W]e presume that the legislature does not intend to enact useless statutes[.]" *City of Albuquerque v. State Mun. Boundary Comm'n*, 2002–NMCA–024, ¶ 11, 131 N.M. 665, 41 P.3d 933. "[T]he legislature can[ ] amend an existing law for clarification purposes just as effectively and certainly as for purposes of change." *State ex rel. Dickson v. Aldridge*, 66 N.M. 390, 396, 348 P.2d 1002, 1005 (1960). The 2003 amendments merely make clearer what was already implicit in the 1999 amendments to Section 56–7–2: indemnification agreements that undermine the indemnitee's incentive to promote safety at New Mexico well sites violate a fundamental public policy of New Mexico and are void and unenforceable; and further, agreements that purport to escape the effect of Section 56–7–2 by invoking foreign law, likewise, are against public policy and are void and unenforceable in New Mexico courts.

{23} We affirm the judgments of the district court.

{24} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge and RODERICK T. KENNEDY, Judge.

---

**2.** In *Reagan* itself, the injured party was not an employee of either of the parties to the indemnity agreement.