IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-030

Filing Date: June 17, 2010

Docket No.  31,860

UNITED RENTALS NORTHWEST, INC.,
an Oregon corporation,

       Plaintiff-Appellant,

v.

YEAROUT MECHANICAL, INC.,
a New Mexico corporation,

       Defendant-Appellee.

CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR
THE TENTH CIRCUIT
**Robert H. Henry, Chief Circuit Judge, Terrence L. O'Brien, Circuit Judge, and
Claire V. Eagan, District Judge**

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward Ricco
Leslie McCarthy Apodaca
Charles J. Vigil
Albuquerque, NM

for Appellant

Atwood, Malone, Turner & Sabin, P.A.
Bryan D. Evans
Roswell, NM

for Appellee

## OPINION

**DANIELS, Chief Justice.**

{1}    The New Mexico Legislature has mandated that any indemnity clause in a

construction contract that seeks to shift tort liability from one party to another "is void, unenforceable and against the public policy of the state." NMSA 1978, § 56-7-1(A) (2005). In this case, we answer a question that has been certified to us by the United States Court of Appeals for the Tenth Circuit: Is a contract for the rental of a scissor lift to be used in the construction of an aircraft hangar a "contract or agreement relating to construction, alteration, repair or maintenance of any real property," and therefore a "construction contract" as defined in Section 56-7-1(E)? We hold that it is.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

{2}     In 2006, Yearout Mechanical, Inc., was a subcontractor installing duct work in the new Eclipse Aviation hangar at the Albuquerque International Sunport. To perform that work along the fifty-foot-high ceiling, Yearout rented a scissor lift on March 1 from an equipment rental company, United Rentals Northwest, Inc., which delivered the lift to the job site the same day.

{3}     Under the terms of the rental contract, Yearout was not authorized to perform any repairs or maintenance on the scissor lift. The contract provided that "[s]hould the Equipment become unsafe, malfunction or require repair, Customer shall immediately cease using the Equipment and immediately notify United" and that "[i]f such condition is the result of normal operation, United will repair or replace the Equipment . . . ." Yearout twice had to call United to the site to perform maintenance on the lift, once on March 28 and again on March 30.

{4}     On April 1, two days after United's last repair, two employees of Yearout, Anthony Magoffe and Camerino Michel Ramirez, boarded the aerial platform of the scissor lift in order to install new sections of duct work on the hangar ceiling. Routine inspections of the lift detected nothing that appeared to be abnormal before the men went aloft. After completing their tasks, Magoffe and Ramirez began their final descent when the scissor lift began rocking back and forth and then fell over sideways. In an effort to save himself, Magoffe grabbed onto a ceiling beam, but he was struck by the falling lift and fell headfirst to his death on the concrete floor nearly fifty feet below. Ramirez remained on the scissor lift's platform during the fall but was ejected when the lift hit the ground. He died before he reached the hospital.

{5}     The workers' personal representatives brought wrongful death actions against both United and the manufacturer of the scissor lift, JLG Industries, Inc. United ultimately settled with the workers' estates after several years of litigation. United then sued Yearout in federal court, arguing that Yearout should be required to reimburse United for its settlement of the workers' suit, not because of any wrongdoing on Yearout's part, but based instead on an "Indemnity/Hold Harmless" clause that was one of twenty-three "Additional Terms and Conditions" preprinted on the back side of United's "Rental Out Contract" signed by Yearout when it rented the scissor lift:

*3. INDEMNITY / HOLD HARMLESS.* TO THE FULLEST EXTENT PERMITTED BY LAW, CUSTOMER AGREES TO INDEMNIFY, DEFEND AND HOLD UNITED [RENTALS] HARMLESS FROM AND AGAINST ANY AND ALL LIABILITY, CLAIM, LOSS, DAMAGE OR COSTS (INCLUDING, BUT NOT LIMITED TO, ATTORNEYS' FEES, LOSS OF PROFIT, BUSINESS INTERRUPTION OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES, DAMAGES RELATING TO BODILY INJURY, DAMAGES RELATING TO WRONGFUL DEATH) CAUSED BY OR IN ANY WAY ARISING OUT OF OR RELATED TO THE OPERATION, USE, MAINTENANCE, INSTRUCTION, POSSESSION, TRANSPORTATION, OWNERSHIP OR RENTAL OF THE EQUIPMENT, INCLUDING WHENEVER SUCH LIABILITY, CLAIM, LOSS, DAMAGE, OR COST IS FOUNDED, IN WHOLE OR IN PART, UPON ANY NEGLIGENT OR GROSSLY NEGLIGENT ACT OR OMISSION OF UNITED [RENTALS] OR THE PROVISION OF ANY ALLEGEDLY DEFECTIVE PRODUCT BY UNITED [RENTALS]. THIS INDEMNITY PROVISION APPLIES TO ANY CLAIMS ASSERTED AGAINST UNITED [RENTALS] BASED UPON STRICT OR PRODUCT LIABILITY CAUSES OF ACTION OR BREACH OF WARRANTY.

(approximate size of text in original).

**{6}** United argued that Yearout, by signing the rental contract, agreed to "indemnify, defend and hold United harmless from and against any and all liability . . . relating to wrongful death" caused by (1) the operation "of the equipment, including . . . [liability founded upon any] negligent act or omission of United," (2) the provision of any "defective product by United," or (3) any claims "based upon strict or product liability . . . ." Yearout moved to dismiss the complaint on the ground that the indemnity clause was unenforceable under Section 56-7-1's provisions invalidating indemnification clauses in contracts related to construction that would shift responsibility for wrongdoing from a culpable party to an innocent party. The United States District Court agreed that Section 56-7-1 encompassed rental contracts related to construction projects and granted Yearout's motion to dismiss United's claim. United appealed to the Tenth Circuit Court of Appeals, which submitted the issue to this Court, pursuant to the certification procedures of Rule 12-607 NMRA under NMSA 1978, Section 39-7-4 (1997).

## II.    DISCUSSION

### A.    Standard of Review

**{7}** This case presents a pure question of statutory interpretation. "The meaning of language used in a statute is a question of law that we review de novo." *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61.

### B.    The Relevant Statutory Provisions

**{8}** The resolution of this case hinges on the interpretation and application of a statutory bar to indemnity clauses contained in "construction contracts":

> A provision in a *construction contract* that requires one party to the contract to indemnify, hold harmless, insure or defend the other party to the contract, including the other party's employees or agents, against liability, claims, damages, losses or expenses, including attorney fees, arising out of bodily injury to persons or damage to property caused by or resulting from, in whole or in part, the negligence, act or omission of the indemnitee, its officers, employees or agents, is void, unenforceable and against the public policy of the state.

Section 56-7-1(A) (emphasis added). The Legislature has provided further guidance by

defining the statutory term "construction contract":

> "[C]onstruction contract" means a public, private, foreign or domestic contract or agreement *relating to* construction, alteration, repair or maintenance of any real property in New Mexico and includes agreements for architectural services, demolition, design services, development, engineering services, excavation or other improvement to real property, including buildings, shafts, wells and structures, whether on, above or under real property.

Section 56-7-1(E) (emphasis added). In order to answer the question certified to us, we therefore must determine whether a contract for rental of equipment to be used in a construction project is a "contract or agreement relating to construction" within the scope of the statute.[1]

## C.    Facial Language Analysis

{9}    The first guiding principle in statutory construction dictates that we look to the wording of the statute and attempt to apply "the plain meaning rule, recognizing that '[w]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation.'" *Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (alteration in original) (citation omitted); *State v. Johnson*, 2009-NMSC-049, ¶ 10, 147 N.M. 177, 218 P.3d 863 ("The primary indicator of legislative intent is the plain language of the statute."). The Legislature itself has codified the plain meaning rule in the Uniform Statute and Rule Construction Act: "The text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997).

{10}    Instead of writing a narrow anti-indemnification statute that addressed only contracts *for* construction, the Legislature defined the statutory scope as including all contracts *relating to* construction. "Relating to" is defined as "hav[ing] connection, relation, or reference [to.]" The American Heritage Dictionary of the English Language 1472 (4th ed., Houghton Mifflin Co. 2000); *see also Bettini v. City of Las Cruces*, 82 N.M. 633, 634, 485 P.2d 967, 968 (1971) (stating that "[s]tatutory words are presumed to be used in their ordinary and usual sense"). A contract to rent equipment that is designed and intended for use in a construction project certainly has a connection, relation, and reference to the construction project and is therefore in literal terms a contract "relating to construction." *See Elliott Crane Serv., Inc. v. H.G. Hill Stores, Inc.*, 840 S.W.2d 376, 380 (Tenn. Ct. App.

---

[1]In 2007, our Legislature declared indemnification agreements in any "rental contract for equipment," whether or not related to construction, unenforceable as "against the public policy of this state." NMSA 1978, § 56-7-3(A) (2007). All relevant events in this case occurred prior to Section 56-7-3's enactment, so we do not rely on its much more comprehensive scope.

1992) (holding that a rental agreement for a construction crane was, in the terms of the Tennessee anti-indemnification statute, an agreement "relative to the alteration, repair or maintenance of a building, structure or appliance" (internal quotation marks and citation omitted)).

**{11}** The facts of this case demonstrate the relationship between the construction equipment rental contract and the construction project in which the scissor lift was to be used. The rental contract written by United specifically recited on its face the name of the construction project, its location, its job number, and the particular phase of construction. United employees delivered the commercial-sized scissor lift to the construction site where it was to be used. United knew it was contracting with Yearout Mechanical, a licensed subcontractor with purchase order credit privileges allowing for payment of charges within 30 days after the rental date. All concerned had to have known the lift was rented for use in relation to construction activities.

**{12}** Despite all those factors, we share United's concern that the term "relating to," standing alone, can be an uncertain term with no clear end to its reach. *See Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."); *cf. McMunn v. Hertz Equip. Rental Corp.*, 791 F.2d 88, 92 (7th Cir. 1986) (noting the danger of construing the word "affecting" too broadly because "[i]n an interrelated economy almost everything affects everything else").

**{13}** Examining the remainder of the statutory language, while often helpful, is not determinative in this case. On the one hand, United argues that rental agreements for construction equipment are not included in the general clause, "agreement[s] relating to construction, alteration, repair or maintenance" of real property, because rental agreements are not named or implied in the ensuing list of specifically included agreements: "architectural services, demolition, design services, development, engineering services, excavation or other improvement to real property." Section 56-7-1(E). Our caselaw, on the other hand, recognizes that the use of the word "includes" to connect a general clause to a list of enumerated examples demonstrates a legislative intent to provide an incomplete list of activities:

> A term whose statutory definition declares what it includes is more susceptible to extension of meaning by construction than where the definition declares what a term means. It has been said the word "includes" is usually a term of enlargement, and not of limitation. . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated. . . .

*In re Estate of Corwin*, 106 N.M. 316, 317, 742 P.2d 528, 529 (Ct. App. 1987) (alterations in original) (internal quotation marks and citation omitted).

5

**{14}** The manner in which the Legislature actually wrote the statute—by providing a list of non-obvious examples—equally supports the contention that it sought to indicate the broad range of agreements "relating to" construction projects. A plain reading of the general phrase "relating to construction, alteration, repair or maintenance" does not clearly indicate that architectural, design, engineering, or development services would be included, nor does it make obvious that deconstruction activities, such as "demolition" and "excavation," are included as activities related to construction projects.

**{15}** In support of its argument that the examples are intended to exclude construction rental contracts, United defines the class of specifically enumerated examples as "*services* performed in connection with a construction project" and argues that a rental service for construction equipment is not a service. While it is true that the specific terms listed, "architectural services, demolition, design services, development, engineering services, [and] excavation," Section 56-7-1(E), are all services to be performed in connection with a construction project, renting construction equipment is also a service that can be performed in connection with a construction project. The contractor's use of rental construction equipment is just as necessary to the completion of a construction project as the use of the designer's vision, the architect's plans, the engineer's specifications, and the developer's resources. On its face, therefore, the statute neither clearly includes nor clearly excludes construction equipment rentals.

**{16}** Because we cannot definitively interpret the statute by a simple consideration of statutory language that is susceptible to more than one interpretation on its face, we must look to other guides of statutory interpretation. *State v. Davis*, 2003-NMSC-022, ¶ 6, 134 N.M. 172, 74 P.3d 1064 (observing that where statutory language is vague or ambiguous, it "is to be construed according to its obvious spirit or reason"); *Tafoya v. Garcia*, 1 N.M. 480, 483 (1871) (We have long adhered to the notion that "[t]he spirit, as well as the letter of the statute, must be respected; and where the whole context of a law demonstrates a particular intent in the legislature to effect a certain object, some degree of implication may be called in to aid that intent." (internal quotation marks and citation omitted)).

### D. Legislative Purpose

**{17}** When interpreting statutes, our primary goal is "to facilitate and promote the legislature's . . . purpose." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citations omitted); *cf. Johnson*, 2009-NMSC-049, ¶¶ 20, 13 (noting that even with respect to "penal statutes[, which] are narrowly construed, [the court should not reject] that sense of the words which best harmonizes with the context and the end in view" and should interpret the statute "in light of the harm or evil it seeks to prevent" (internal quotation marks and citations omitted)).

**{18}** New Mexico precedent has recognized that Section 56-7-1 is "based on a public policy promoting safety in construction projects by holding each party to the contract accountable for injuries caused by its own negligence." *City of Albuquerque v. BPLW*

*Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 19, 146 N.M. 717, 213 P.3d 1146 (distinguishing between a lawful indemnification clause requiring wrongdoers to indemnify and an unlawful indemnification clause requiring wrongdoers to be indemnified). The federal courts also have emphasized the New Mexico Legislature's "strong public policy" of encouraging the exercise of due care in construction activities "to protect construction workers and future occupants of a building by ensuring that all those involved in its construction know that they will be held financially liable for their negligence." *Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 217-19 (10th Cir. 1992) (holding that New Mexico's policy against indemnification clauses in contracts related to New Mexico construction projects is sufficiently compelling to override California's interest in enforcing terms of California contracts, because such clauses "significantly interfere with New Mexico's efforts to produce safe workplaces and buildings"); *cf. Guitard v. Gulf Oil Co.*, 100 N.M. 358, 362, 670 P.2d 969, 973 (Ct. App. 1983) ("the public policy behind [NMSA 1978, Section 56-7-2 (2003), invalidating indemnification clauses in agreements related to drilling and mining operations] is to promote safety"); *Piña v. Gruy Petroleum Mgmt. Co.*, 2006-NMCA-063, ¶ 19, 139 N.M. 619, 136 P.3d 1029 ("[The] safety concerns underlying Section 56-7-2 are not limited to the immediate parties to an indemnity agreement. . . . Section 56-7-2 [also] protects third parties whose person or property would be placed at risk by the indemnitee's indifference to safety.").

**{19}**   In enacting the anti-indemnification statutes, the Legislature overrode competing public policies favoring the freedom to contract. In general, parties have the freedom to enter into contracts that exculpate one party from liability for its own negligence unless the agreements are "violative of law or contrary to some rule of public policy." *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶¶ 27, 53, 134 N.M. 341, 76 P.3d 1098 (holding that legislative policy invalidated the contract clause releasing a horse stable from liability for its own negligence).

**{20}**   In its anti-indemnification statutes, the Legislature has implicitly recognized what our courts have expressly articulated as the societal benefits that can be promoted by holding wrongdoers responsible for the harmful consequences of their own behavior. "Our fault system of recovery . . . serves the important social functions," among others, of "deterring conduct that society regards as unreasonable or immoral, and providing a vehicle by which . . . society may give voice and form to its condemnation of the wrongdoer." *Trujillo v. City of Albuquerque*, 110 N.M. 621, 624, 798 P.2d 571, 574 (1990), *overruled on other grounds*, 1998-NMSC-031, ¶ 2, 125 N.M. 721, 965 P.2d 305; *see also Hagebak v. Stone*, 2003-NMCA-007, ¶ 20, 133 N.M. 75, 61 P.3d 201 (recognizing that the public policy goal of deterring conduct that society regards as unreasonable or immoral is served by holding wrongdoers liable for their own conduct).

**{21}**   If, as the caselaw has recognized, a legislative purpose in invalidating anti-indemnification clauses in agreements "relating to" construction projects is to make the workplace safer, it is difficult to articulate a principled basis for excluding construction equipment rental agreements from the intended scope of the statute. For example, if Yearout

had subcontracted with United to construct scaffolding to be used at the building site to install ducts on the hangar ceiling, and United's negligence in constructing the scaffolding had caused two employees to plunge to their deaths, the statute undeniably would prohibit United's reliance on any anti-indemnification clause to shift the economic consequences of its own liability back to Yearout. We can perceive no principled difference between that situation and the case at bar in which United, instead of constructing scaffolding, provided to Yearout and was responsible for keeping in good repair a scissor lift that Yearout used to perform the same work and that caused the same fatal results. United has articulated no policy justifying any such distinction throughout these proceedings, relying instead on formalistic statutory construction arguments. We now examine those arguments.

**E.      Statutory Provisions In Pari Materia**

**{22}**    As our precedents exemplify, where a plain language analysis does not provide a clear interpretation, we can "look to other statutes in pari materia in order to determine legislative intent." *State v. Martinez*, 1998-NMSC-023, ¶ 9, 126 N.M. 39, 966 P.2d 747. This approach "has the greatest probative force in the case of statutes relating to the same subject matter passed at the same session of the legislature." *Davis*, 2003-NMSC-022, ¶ 12.

**{23}**    In 1971, the Legislature enacted two different anti-indemnity statutes: NMSA 1953, Section 28-2-1 (Vol. 5, 1975 Pocket Supp.), which voided indemnity clauses in contracts "relating to" construction activities, and NMSA 1953, Section 28-2-2 (Vol. 5, 1975 Pocket Supp.), which voided indemnity clauses in contracts "pertaining to" drilling or mining operations. Both statutes were recodified in 1978 as NMSA 1978, Sections 56-7-1 and 56-7-2, respectively, and have been amended from time to time since their original enactment.

**{24}**    United argues that because only Section 56-7-2, the statute addressing drilling and mining activities, contained express language referring to equipment rental agreements, the Legislature intended to exclude rental agreements from the scope of Section 56-7-1, the statute addressing construction activities. The original language of Section 56-7-2(B) provided, in pertinent part:

> An "agreement pertaining to any well for oil, gas or water, or mine for any mineral" means any agreement . . . concerning any operations related to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging or otherwise rendering services in, or in connection with, any well drilled for the purpose of producing or disposing of oil, gas or other minerals or water, and designing, excavating, constructing, improving or otherwise rendering services on, or in connection with, any mine shaft, drift or other structure intended for use in the exploration for, or production of, any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, *including the furnishing or rental of equipment, incidental transportation and other goods and services furnished in connection with any*

8

*such service or operation.*

NMSA 1953, § 28-2-2(B) (1971) [§ 56-7-2(B) (amended 2003)] (emphasis added).

**{25}**     Among the numerous differences between the wording of Sections 56-7-1 and 56-7-2 is that Section 28-2-2(B) [Section 56-7-2(B)] specifically mentions equipment rentals and Section 28-2-1 [Section 56-7-1] does not.  The inference United asks us to draw is that the Legislature must have intended to prohibit indemnification clauses in drilling and mining equipment rental agreements, but to permit them in construction equipment rental agreements.  We note that in general, "if a statute on a particular subject omits a particular provision, inclusion of that provision in another related statute indicates an intent [that] the provision is not applicable to the statute from which it was omitted."  *Howard Jarvis Taxpayers Ass'n v. City of Salinas*, 121 Cal. Rptr. 2d 228, 232 (Cal. Ct. App. 2002) (alteration in original) (internal quotation marks and citation omitted).  However, as with most maxims of statutory construction, the rule "is no more than a rule of reasonable inference and cannot control over the lawmakers' intent."  *Id.* at 233 (internal quotation marks and citation omitted); *Atchison, T. & S. F. Ry. Co. v. Town of Silver City*, 40 N.M. 305, 309, 59 P.2d 351, 354 (1936) ("Canons of construction are but aids in determining legislative intent and are not controlling if they lead to a conclusion, which by the terms or character of the legislation manifestly was not intended.").

**{26}**     Other varying language in the mining and construction anti-indemnification statutes exemplifies the need for caution in using simplistic and formulaic analyses of statutory wording.  For example, the original language of Section 28-2-2(A) [Section 56-7-2(A)] barred indemnity agreements for "death or bodily injury to persons" in drilling- and mining-related agreements, while the language of Section 28-2-1 [Section 56-7-1] barred indemnity agreements "arising out of bodily injury to persons."  It would be unreasonable, however, to assume that Section 28-2-1's [Section 56-7-1's] omission of "death" and Section 28-2-2(A)'s [Section 56-7-2(A)'s] express mention of the term meant that the Legislature intended to prohibit only construction indemnity agreements shifting liability for bodily injury, but to allow liability-shifting for any deaths that might result from the same kind of actionable conduct.  *See Smith*, 2004-NMSC-032, ¶ 10 ("This Court has rejected a formalistic and mechanical statutory construction when the results would be absurd, unreasonable, or contrary to the spirit of the statute.").

**{27}**     Our precedents have repeatedly cautioned against using wording variations in pari materia statutes as a conclusive determinant of differing legislative intent.  For example, in *Martinez*, we addressed a similar statutory construction issue in deciding whether the Legislature intended to prohibit credit for presentence confinement in third-offense DWI cases. 1998-NMSC-023, ¶ 7.  The statute relating to first-offense DWI specifically provided that presentence confinement would be credited toward service of the ultimate sentence; the statute relating to fourth and subsequent offenses contained a similar express provision; but the statute applicable to second and third offenses did not mention the subject.  *Id.* ¶ 15.  Despite the different wording in the statutes, this Court found it unreasonable to conclude

9

that "the Legislature intended to treat second and third offenders more severely than fourth and subsequent offenders." *Id.* We have repeatedly viewed related statutes in light of their common legislative policies. *See Davis*, 2003-NMSC-022, ¶ 12 (holding that in interpreting ambiguous language in a statute relating to consecutive sentencing, it was appropriate to consider that related enactments reflected that the "legislative intent was to get tougher on crime"); *State v. Rivera*, 2004-NMSC-001, ¶¶ 14, 26, 134 N.M. 768, 82 P.3d 939 (interpreting a statute to permit service and revocation of probation while on appeal, despite statutory language that sentence was stayed on appeal). In determining legislative policy and intent, "a statutory subsection may not be considered in a vacuum, but must be considered in reference to the statute as a whole and in reference to statutes dealing with the same general subject matter." *Rivera*, 2004-NMSC-001, ¶ 13.

**{28}** In its written opinion granting Yearout's motion to dismiss, the United States District Court observed that "[i]t is simply inconceivable that the New Mexico Legislature, when contemporaneously enacting two anti-indemnity statutes, intended to give more protection to well and mine workers than to construction workers." *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, Civ. No. 08-00050 RLP/CD, mem. op. and order at 6 (D.N.M. Dec. 5, 2008). We similarly can find no reason to conclude that the Legislature intended to create different protections for mine workers and construction workers simply because equipment rentals are specifically mentioned as being encompassed in the general categories of agreements "pertaining to" wells and mines in Section 56-7-2 and the same clarifying language is not mentioned with regard to the scope of agreements "relating to" construction in Section 56-7-1.

**{29}** United also argues that the Legislature's 1999 removal of the specific mention of equipment rentals in Section 56-7-2 manifested an intention to exclude rental contracts from the anti-indemnity statutes altogether. We disagree.

**{30}** The Legislature's 1999 amendments to Section 56-7-2 were made largely for clarity and organization. Section 28-2-2(A) [Section 56-7-2(A)] of the original act read:

> [Agreements purporting] to indemnify . . . against loss or liability for damages, for:
> | (1) | death or bodily injury to persons; or |
> | (2) | injury to property; or |
> | (3) | any other loss, damage or expense arising under either Paragraph (1) or (2) or both; or |
> | (4) | any combination of these . . . . |

The Legislature replaced the language in 1999 with the following equivalent phrase: "[Agreements purporting] to indemnify . . . against loss or liability for damages." The modification loses nothing of substance but makes the provision more concise and clear. Section 56-7-2(A). Similarly, the Legislature in 1999 deleted "or understanding, written or oral" from the phrase "any agreement or understanding, written or oral" in Section 28-2-2(B)

10

[Section 56-7-2(B)] of the original act.

**{31}** The Legislature in 1999 also replaced the original Section 28-2-2(B) [Section 56-7-2(B)] phrase, "an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation and other goods and services furnished in connection with any such service or operation," with "an agreement . . . to perform a portion of the work or services . . . or an act collateral thereto." Section 56-7-2(B). In short, the Legislature removed all the specific examples of included activities and kept only the categorical term.

**{32}** If equipment rentals were already included in the categorical terms of the two statutes, the removal of the specific examples of included items did not decrease the scope of those general terms. In fact, an indication that the Legislature did not intend to abandon a policy of prohibiting indemnification clauses in mining and construction-related equipment rentals was the significant extension in 2007 of the Legislature's anti-indemnification public policy to encompass all equipment rental agreements, not just those related to mining or construction. NMSA 1978, § 56-7-3 (2007).

## F.   Cases and Statutes in Other Jurisdictions

**{33}** Although it is not critical to our decision, we note that many other jurisdictions have interpreted analogous statutes to encompass indemnity clauses in construction equipment rental agreements. 3 Philip L. Bruner & Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 10:79 (2002) ("Many courts have decided that equipment leases fall within the scope of these anti-indemnity laws. Equipment leases are often captured by the scope of these laws by virtue of the language that indemnity agreements 'in connection with or collateral to' a construction contract are barred." (footnote omitted)).

**{34}** For instance, *Aetna Casualty & Surety Co. v. Marion Equipment Co.*, 894 P.2d 664 (Alaska 1995), addressed the impact of an Alaska anti-indemnity statute on an indemnity clause contained in a lease agreement for a construction hoist. Alaska's statute stated that an "agreement contained in, collateral to, or affecting a construction contract that purports to indemnify the promisee against liability [for its own negligence or misconduct] is against public policy and is void and unenforceable." *Id.* at 666; *see also* Alaska Stat. § 45.45.900 (1975). The Supreme Court of Alaska, persuaded by the "body of authority, coupled with the [lease] language," held that the equipment lease fell within the scope of its anti-indemnity statute. *Aetna*, 894 P.2d at 667.

**{35}** *Aetna* noted that "at least eighteen other states have enacted statutes identical or similar to AS 45.45.900, and the weight of authority from the jurisdictions that have considered this question indicates that the statute does govern such leases." *Id.* at 666 (footnote omitted). A number of the cases surveyed in *Aetna* are instructive on the issue before this Court. In *Calkins v. Lorain Division of Koehring Co.*, 613 P.2d 143 (Wash. Ct. App. 1980), a contractor leased a crane to dismantle a chemical plant. After an employee

11

of the contractor was injured and sued the rental company, the company invoked an indemnity clause in the rental agreement to have the contractor assume the company's liability for the defective condition of the leased crane. *Id.* at 144. The court struck the indemnity clause as violative of the policy expressed by Washington's anti-indemnity statute. *Id.* The court also expressed concern about the potential impact of indemnification clauses in equipment rental agreements on the public policies embodied in workers' compensation statutes, to avoid imposing tort liability on employers who provide workers' compensation coverage for their employees, policies which would be frustrated by permitting indemnification clauses in construction equipment rental agreements. *Id.* at 145.

{36}    Several cases relied on by *Aetna* turned on whether the piece of equipment rented was intended or expected to be used in construction activities. *See, e.g.*, *American Pecco Corp. v. Concrete Bldg. Sys. Co.*, 392 F. Supp. 789, 793 (N.D. Ill. 1975) ("The crane was designed to be used in construction activities. Central cannot logically claim it was unaware of the use to which the crane would be put, when the crane was in fact put to a designed use."); *Folkers v. Drott Mfg. Co.*, 504 N.E.2d 132, 137 (Ill. App. Ct. 1987) (striking the indemnity clause because the rental contract provided that the rental would be "for use in construction operations").

{37}    United correctly notes that many other state courts have chosen not to interpret their anti-indemnity statutes as applicable to equipment rentals. Most of those cases are distinguishable in that the opinions emphasized that the contracting parties did not contemplate the equipment was to be used in a construction project. *See McMunn*, 791 F.2d at 93 (holding that the Illinois construction anti-indemnity statute did not extend to a rental contract for a bobcat loader because the equipment was not clearly intended for construction use and because bobcat loaders are most commonly used for purposes unrelated to the statute's scope); *Palmour v. Gray Ins. Co.*, 731 So. 2d 911, 913-14 (La. Ct. App. 1999) (holding that the Louisiana statute prohibiting anti-indemnification agreements pertaining to wells and mines did not invalidate an indemnity clause in a crane rental contract where the crane was rented for use "in some unnamed purpose"); *Reliance Ins. Co. v. Chevron U.S.A. Inc.*, 713 P.2d 766, 767-68 (Wyo. 1986) (refusing to extend Wyoming's oilfield anti-indemnity statute to the lease of caterpillar tractors for digging holding pits for waste water and oil created by a fire at an oil facility).

{38}    Other cases are distinguishable as a matter of law because they interpret more narrowly written statutes. *See, e.g.*, *Eagle Pacific Ins. Co. v. Quintanilla*, 923 So. 2d 266, 268, 270 (Miss. Ct. App. 2006) (construing a Mississippi statute that requires the contract be "for construction," not simply "relating to construction").

{39}    It is clear that some courts in states with anti-indemnity statutes have chosen to construe the protections of their statutes in a more restrictive manner. *See, e.g.*, *Pritts v. J.I. Case Co.*, 310 N.W.2d 261, 267 (Mich. Ct. App. 1981) ("Although it could be argued that the instant lease was 'relative to' construction because the lift truck would be used in construction, we refuse to extend the statute that far."). We decline to interpret our own anti-

indemnity statutes so narrowly, in light of our analysis of the New Mexico statutory language and its underlying policies. We interpret Section 56-7-1 as prohibiting indemnification clauses in agreements for the rental of equipment designed or intended to be used in construction activities, which meet the statutory definitional standard of agreements "relating to construction." In doing so, we are confident that we honor the New Mexico Legislature's purposes, policies, and language.

## III.    CONCLUSION

{40}    In order to enforce the protections of Section 56-7-1 and to honor the legislative purpose embodied in the statute, we answer the certified question by holding that the statute's anti-indemnity protections apply to rental contracts for construction equipment because they are contracts "relating to construction."

**{41}    IT IS SO ORDERED.**

_____
                                    **CHARLES W. DANIELS, Chief Justice**

**WE CONCUR**:

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

**Topic Index for _United Rentals Northwest, Inc. v. Yearout Mechanical_, No. 31,860**

| **AE** | **APPEAL AND ERROR** |
| AE-CT | Certification |

| **CN** | **CONTRACTS** |
| CN-CO | Contracts Against Public Policy |
| CN-CG | Contracts, General |
| CN-ID | Indemnification Agreement |

| **NG** | **NEGLIGENCE** |

NG-ID            Indemnification

**ST**            **STATUTES**
ST-AP            Applicability
ST-IP            Interpretation
ST-LI            Legislative Intent
ST-RC            Rules of Construction