# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **April 30, 2018**

**No. A-1-CA-35584**

**MICHAEL D. LEWIS, as surviving spouse of**
**PATRICIA A. LEWIS, deceased,**

Claimant-Appellee/Cross-Appellant,

v.

**ALBUQUERQUE PUBLIC SCHOOLS,**

Employer-Appellant/Cross-Appellee.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Leonard J. Padilla, Workers' Compensation Judge**

Gerald A. Hanrahan
Albuquerque, NM

for Claimant-Appellee

Yenson, Allen & Wosick, P.C.
Matthew L. Connelly
Michael D. Russell
Albuquerque, NM

for Employer-Appellant

# OPINION

**BOHNHOFF, Judge.**

{1} Patricia Lewis (Worker) sought and obtained an award of workers' compensation disability benefits after she contracted Allergic Bronchopulmonary Aspergillosis (ABPA) as a result of exposure to aspergillus mold while employed with Albuquerque Public Schools (Employer). Following Worker's death, her widower, Michael Lewis (Claimant), sought and the Workers' Compensation Judge (WCJ) awarded workers' compensation death benefits under the Workers' Compensation Act (the Act), NMSA 1978, 52-1-1 to 52-1-70 (1929, as amended through 2017). On appeal, Employer makes four arguments: (1) the WCJ erred in concluding that Worker's death occurred within two years of her compensable work injury, and thus that the death benefits claim was not barred by the applicable statute of limitations; (2) the WCJ erred in excluding medical records and testimony that supported Employer's position that Worker died as a result of cancer unrelated to the ABPA; (3) related to the second issue, the WCJ erred in finding that Claimant's medical evidence regarding the cause of Worker's death was uncontradicted; and (4) even if Claimant was entitled to death benefits, the amount of benefits that the WCJ awarded was erroneous. Claimant cross appeals, arguing that the WCJ erred by not awarding death benefits at 100% of Worker's compensation rate. We affirm on

Employer's first argument, reverse on the second and third arguments, and affirm on the fourth argument. We reverse on Claimant's cross-appeal argument. We remand for a new trial on whether Worker's ABPA caused Worker's death.

**BACKGROUND**

{2}     Worker was employed by Employer from 1999 until 2013 and taught at Manzano High School in Albuquerque, New Mexico for a number of years. At the beginning of the 2011-2012 school year, she was assigned to teach classes in a new classroom, Room J-13. Worker complained to Employer about the presence of mold in Room J-13. Her primary care physician, Dr. John Liljestrand, began treating her for difficulty breathing on October 3, 2011. Dr. Liljestrand wrote to Employer in December 2011 advising that Worker's respiratory problems were attributable to her classroom. Thereafter, Dr. Liljestrand referred Worker to Dr. Steven Tolber, an allergist and immunologist who was already treating Worker, to be treated for her respiratory issues. Dr. Tolber began treating her for respiratory issues related to exposure to mold in Room J-13 on April 18, 2012.

{3}     Dr. Tolber wrote a letter to Employer at the end of the 2011-2012 school year that stated Worker could not return to Room J-13. On October 22, 2012, Dr. Tolber diagnosed Worker with ABPA and stated that the ABPA was caused by Worker's exposure to aspergillus mold in her classroom. Worker regularly continued to work

and earn her regular salary until December 21, 2012. From December 22, 2012 to March 31, 2013, Worker drew upon available sick leave time and thus did not lose any pay. Worker terminated her employment with Employer by retiring effective March 31, 2013.

{4}      During this same general time period, Worker faced another medical condition. She had been treated for breast cancer in 1997, but the disease had been in remission until late 2012 when it was discovered to be metastatic. Worker began chemotherapy in 2013 that continued into 2014. Worker's oncologist was Dr. Richard Giudice of the New Mexico Cancer Center.

{5}      Worker filed a claim for workers' compensation disability benefits on March 6, 2013. She alleged that her continued exposure to aspergillus mold after she started working in Room J-13 caused her disability.

{6}      Worker's claim for disability benefits was tried over the course of two days in June 2014. The parties stipulated that Worker's employment with Employer ended on March 31, 2013, and that she had not earned her weekly wage since then. During the trial, the WCJ admitted into evidence the depositions and medical records of Dr. Liljestrand and Dr. Tolber. The WCJ also admitted Dr. Giudice's February 21, 2014 deposition.

{7}     The WCJ issued his compensation order on December 16, 2014. He made the following findings, among others: (1) Worker was exposed to aspergillus spores while teaching in her classroom at Manzano High School; (2) On October 22, 2012, Dr. Tolber diagnosed Worker with ABPA; and (3) Worker's ABPA was caused by her exposure to aspergillus in Room J-13. The WCJ specifically found that

> [t]here is a causal connection between Worker's accidental injury (ABPA) and her resulting disability and the injury is reasonably incident to Worker's exposure to aspergillus in [Room] J-13 . . . Worker's accidental exposure to aspergillus arose out of, and occurred within the course and scope of, Worker's employment with Employer . . . Worker's ABPA and resulting disability [were] a natural and direct result of her exposure to aspergillus while working for Employer.

{8}     Additionally, the WCJ found that "[d]ue to ABPA, Worker [was] unable to perform the duties of high school teacher since April 1, 2013." The WCJ awarded Worker Temporary Total Disability (TTD) benefits from April 1, 2013 to January 15, 2014. The WCJ also found that Worker suffered a compensable injury with permanent impairment and that Worker was entitled to Permanent Partial Disability (PPD) benefits of 99% from January 16, 2014 and continuing for 700 weeks. Employer did not appeal the December 16, 2014 compensation order.

{9}     Dr. Liljestrand last saw Worker in March 2014. Dr. Tolber last saw Worker in September 2014. Worker continued, however, to be seen by Dr. Giudice and receive treatment for her cancer.

4

{10}     Dr. Tolber's notes of Worker's appointments with him on May 14, 2014 and May 29, 2014 reflect concern about "fluid overload" and shortness of breath, and whether those issues were attributable to the chemotherapy. On September 23, 2014, Worker was advised by the New Mexico Cancer Center that her white blood cell count was low due to the chemotherapy. Worker had additional appointments at the New Mexico Cancer Center on October on the 4, 7, and 21, 2014 and November 11, 2014. Worker was seen by Dr. Giudice on October 21 and November 11, 2014. On November 11, 2014, Worker complained of shortness of breath, but a chest x-ray taken that day did not reveal pneumonia. Worker was to return to Dr. Giudice the next day for further examination and treatment. While leaving her home to go to the hospital the morning of November 12, 2014, Worker collapsed and died. No autopsy was performed.

{11}     Worker's disability benefits terminated upon her death.  Section 52-1-47(C).[1] Claimant filed a claim for workers' compensation death benefits on January 22, 2015 alleging that Worker's ABPA was the cause of her death. In its answer to the death benefits complaint, Employer admitted all of the findings of fact and conclusions of law contained in the first compensation order. Employer further admitted that the findings and conclusions in the first compensation order were binding on the death

[1]Section 52-1-47 was amended in 2015, but subsection (C) remains the same as it was in the 1990 version.

5

benefits proceeding. However, Employer disputed the timeliness of the death benefits claim and the cause of death. The WCJ issued a pre-trial order on October 30, 2015 indicating that prior WCA orders entered during the disability benefits proceeding on May 18, 2014 and December 16, 2014 established the law of the case as to the death benefits trial.

{12} The death benefits claim was tried on November 12, 2015. Claimant testified. In addition, the WCJ admitted Claimant's exhibits, which included the additional depositions of Dr. Tolber and Dr. Liljestrand that were taken on October 14 and August 20, 2015, respectively, and Worker's certificate of death, which was prepared by Dr. Liljestrand. The death certificate listed "pneumonia" and "chronic pneumonitis" as the causes of death. Dr. Liljestrand testified that Worker's ABPA was either a direct or a contributing cause of these conditions. Dr. Tolber testified that Worker "most likely died of ABPA."

{13} At the death benefits trial, Employer offered into evidence, among other exhibits, the February 21, 2014 deposition of Dr. Giudice—which had been admitted without objection during the first disability benefits trial. Employer also offered into evidence a second deposition of Dr. Giudice taken after Worker had passed away dated September 14, 2015. Claimant, however, objected to admission of the Giudice depositions and records, arguing that, under Section 52-1-51(C), only a health care

6

provider (HCP) who has provided care for a worker's work-related injury pursuant to Section 52-1-49, or an independent medical examiner identified pursuant to Section 52-1-51(A), could testify as to the cause of death in connection with a claim for death benefits under Section 52-1-46. Because Dr. Giudice was neither an authorized HCP under Section 52-1-49 nor an independent medical examiner under 52-1-51(A), Claimant urged, he could not testify about Worker's cause of death. The WCJ agreed with Claimant and denied admission of the Giudice depositions and the New Mexico Cancer Center records.

{14} In his 2015 deposition, when asked to identify the documentation that he reviewed to determine Worker's cause of death, Dr. Liljestrand could not verify that he reviewed any documentation. Instead, his cause of death determination was based on a discussion with Claimant. Dr. Liljestrand had not reviewed any information from the New Mexico Cancer Center regarding the treatment Worker had received in the fall of 2014, including on November 11. Similarly, in his 2015 deposition, Dr. Tolber acknowledged that he had not reviewed any of the records of Worker's care and treatment at the New Mexico Cancer Center from March 2014 to November 2014. All of the information that Dr. Tolber had concerning how Worker died was provided by Claimant. When asked what he knew about the circumstances of her death, Dr. Tolber

testified only to what he had been told about Worker's shortness of breath and that he had "not seen the [results] on the autopsy, so I don't know."

{15} On April 21, 2016, the WCJ issued his compensation order concerning the death benefits claim. The order makes the following findings: (1) "Worker established a causal connection between the ABPA and her place of employment"; (2) "As a result of a compensable injury, Worker was awarded compensation benefits"; (3) Dr. Liljestrand found that Worker's ABPA was either a direct cause or a contributing cause of what he listed on Worker's death certificate for causes of death; (4) Dr. Tolber testified that Worker "most likely died of ABPA"; (5) "There is a causal connection between Worker's ABPA and her resulting death"; (6) "The medical evidence and testimony establishing causation is uncontradicted"; (7) "Compensation benefits for death are payable to eligible dependents if an accidental injury sustained by a worker proximately results in the worker's death within the period of two years following the worker's accidental injury"; (8) "The two year time limit for bringing a claim for death benefits begins to accrue from the date the compensable injury manifests itself or from when the worker knows or should know [s]he has suffered a compensable injury"; (9) "Due to ABPA, Worker was unable to perform the duties of high school teacher beginning on April 1, 2013"; (10)

8

"Worker's injury manifested itself on April 1, 2013"; and (11) "Worker's death on November 12, 2014, occurred within two years of April 1, 2014."[2]

**ANALYSIS**

**I.       Worker's Death Occurred Within Two Years of Her Compensable Injury; Claimant's Claims Therefore Are Not Time-Barred**

**A.       Standard of Review**

{16}     "All workers' compensation cases are reviewed under a whole record standard of review." *Moya v. City of Albuquerque*, 2008-NMSC-004, ¶ 6, 143 N.M. 258, 175 P.3d 926. "On appeal, to determine whether a challenged finding is supported by substantial evidence, we have always given deference to the fact[-]finder, even when we apply . . . whole record review." *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 12, 146 N.M. 453, 212 P.3d 341 (internal quotation marks and citation omitted). "The reviewing court starts out with the perception that all evidence, favorable and unfavorable, will be viewed in the light most favorable to the agency's decision." *Tallman v. ABF (Arkansas Best Freight)*, 1988-NMCA-091, ¶ 18, 108 N.M. 124, 767 P.2d 363. However, we "may not view favorable evidence with total disregard to contravening evidence." *Id.* ¶ 13 (internal quotation marks and citation omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not mean

---

[2]We assume the WCJ meant April 1, 2013, in part because in the conclusions of law section the judge writes that Worker's death occurred within two years of April 1, 2013.

9

the agency's findings are unsupported by substantial evidence." *Id.* ¶ 15. "Substantial evidence on the record as a whole is evidence demonstrating the reasonableness of an agency's decision . . . and we neither reweigh the evidence nor replace the fact finder's conclusions with our own." *DeWitt*, 2009-NMSC-032, ¶ 12 (citation omitted).

{17} "When our review consists of reviewing a WCJ's interpretation of statutory requirements, we apply a de novo standard of review." *Laughlin v. Convenient Mgmt. Servs., Inc.*, 2013-NMCA-088, ¶ 9, 308 P.3d 992 (internal quotation marks and citation omitted). "We review the WCJ's application of the law to the facts de novo." *Id.*

{18} Section 52-1-46 states in part that, subject to certain limitations enumerated within the statute, death benefits shall be paid "if an accidental injury sustained by a worker proximately results in the worker's death within the period of two years following the worker's accidental injury[.]" For purposes of this case, the key language is the phrase "accidental injury[,]" which is the triggering event for the limitations period. We review de novo the WCJ's interpretation of this phrase as well as the application of the law to the facts to determine when Worker's accidental injury occurred. *Laughlin*, 2013-NMCA-088, ¶ 9.

**B.      Worker's Death Occurred Within Two Years of Her Compensable Injury**

{19}      Employer argues that Worker's death occurred more than two years after her compensable injury because she either knew or should have known she had a compensable injury on or between August 7, 2011 and October 22, 2012, and thus her compensable injury manifested itself sometime between those two dates. Claimant argues that the WCJ's finding that Worker's death was within two years of her compensable injury is supported by the evidence presented during the death benefits trial. Claimant also argues that the date Worker's compensable injury manifested itself is the same date that the injury became compensable.

{20}      Employer's position is not consistent with New Mexico precedent. In *Gambrel v. Marriott Hotel*, 1991-NMCA-100, ¶¶ 12-13, 112 N.M. 668, 818 P.2d 869, this Court addressed when an accidental injury occurs for purposes of applying Section 52-1-46's limitations period for death benefits. We noted that the legislative purpose underlying the provision of disability and death benefits—providing for the financial security of a worker and his family—was the same for both types of benefits. *See Gambrel*, 1991-NMCA-100, ¶ 6 ("[W]e believe the broad policy contours underlying the Act are identical whether worker is disabled or dies as a result of the accidental injury."). Given that common purpose, we determined that the trigger event for the

limitation period for death benefits would be given the same construction as the trigger event for disability benefits:

> We, therefore, apply the meaning "date when the compensable injury manifests itself" or "date when the work[er] knows or should know he has suffered a compensable injury" to all of the portions of [the Act] where the terms "time of accident," "time of injury," "date of disability," "date of accidental injury," or words of similar import, are used[.]

*Id.* ¶ 12 (citation omitted). We ultimately applied the second definition, the date when the worker knows or should know he or she has suffered a compensable injury, in concluding that the death benefits claim in question was not barred by the two-year limitations period. *Id.* ¶ 15. We follow *Gambrel* here and define the date of Worker's accidental injury as the date that she knew or should have known of her compensable injury.

{21} In this case, Claimant has a death benefits claim only if Worker died within two years of the date that she knew or should have known that she had suffered a compensable injury due to her exposure to aspergillus mold. Worker died on November 12, 2014. Thus, if Worker knew or should have known that she had a compensable injury *before* November 12, 2012, Section 52-1-46 bars Claimant's claim for death benefits. On the basis of the WCJ's findings of fact regarding the statute of limitations issue, which Employer does not challenge on appeal, we determine that Worker knew or should have known she had a compensable injury on

12

April 1, 2013, which is within two years of Worker's death on November 12, 2014. Based on the analysis that follows, we affirm the WCJ with respect to the statute of limitations issue raised by Employer.

{22} When Worker's injury became *compensable* is crucial to the determination of when she knew or should have known she had a compensable injury. Within the Act, there are benefits for TTD (Section 52-1-25.1), PPD (Section 52-1-26), Permanent Total Disability (PTD) (Section 52-1-25), and scheduled injuries (Section 52-1-43). *See Torres v. Plastech Corp.*, 1997-NMSC-053, ¶ 14, 124 N.M. 197, 947 P.2d 154 (describing the four different forms of disability under the Act). Therefore, for an injury to be compensable, which is part of the triggering event for Section 52-1-46's limitations period according to *Gambrel*, the worker must know or have reason to know that he or she is entitled to TTD, PPD, PTD, or scheduled benefits. 1991-NMCA-100, ¶¶12-13.

{23} *Torres* discusses the limitations period of Section 52-1-31(A), which provides that if an employer fails to pay or refuses to pay a worker compensation to which he or she is entitled under the Act, after the worker has given the employer notice of the accident in a timely fashion, the worker must file a claim for compensation within one year of when the employer failed to pay or refused to pay compensation. *Torres*, 1997-NMSC-053, ¶ 10. The statute further provides that the limitations period will

13

be tolled for up to one year if the worker is still employed by the employer. Thus, an employer "shall begin to pay compensation not later than thirty-one days after the date of the occurrence of the disability and is not deemed to have failed or refused to pay compensation until the expiration of this time period." *Id.* ¶ 7 (internal quotation marks and citation omitted). It is therefore necessary to determine the "date of the occurrence of the disability" to determine when an employer fails or refuses to pay compensation, which failure or refusal then triggers—subject to the possible one-year tolling period—Section 52-1-31(A)'s one-year limitations period for the worker to file a claim for benefits. *See Torres*, 1997-NMSC-053, ¶¶ 7-8.

{24}    *Torres* concluded "that the status of disability [either TTD, PPD, or PTD] or the existence of a scheduled injury is a necessary element required to trigger the statute of limitations[.]" *Id.* ¶ 6. *Torres* identified the triggering event for the statutory limitations period to be when it is reasonably apparent, or should be reasonably apparent, that the worker has "an injury on account of which he is entitled to compensation[.]" *Id.* ¶ 11 (internal quotation marks and citation omitted). According to *Torres*, this triggering event has two elements: "(1) an injury *entitling the worker to compensation under the Act*; and (2) knowledge, or imputed knowledge, by the worker of this injury." *Id.* (emphasis added).

14

{25}   While *Torres* was applying a different limitations period than the one established by Section 52-1-46 for death benefits, *Torres* informs our analysis here given the holding in *Gambrel*, which equates the limitations period of Section 52-1-46 (triggered by the date of accidental injury) with "the terms 'time of accident,' 'time of injury,' 'date of disability,' 'date of accidental injury,' or words of similar import" as used elsewhere in the Act. *Gambrel*, 1991-NMCA-100, ¶ 12. Based on *Torres*, we determine that the limitations period of Section 52-1-46 was not triggered until Worker knew or should have known she had an injury entitling her to TTD, PPD or PTD disability benefits. *See Torres*, 1997-NMSC-053, ¶ 12 ("Therefore, subtracting two years and thirty-one days from the date of filing, we must determine whether there is substantial evidence that [the worker] knew, or should have known, of her injury *and* that [she] was *entitled to compensation* before February 26, 1993." (emphasis added)). Because Worker did not have a scheduled injury, that potential trigger for the running of the death benefits statute of limitations need not be addressed.

{26}   Other cases, although decided before 1990 when the Act articulated the different types of disability that exist today, are consistent with *Torres*' holding that the date of the occurrence of the disability is when the worker knows or should know that he or she has an injury *and* is entitled to compensation for that injury. In *Lovato*

*v. Duke City Lumber Co.*, 1982-NMCA-021, ¶ 3, 97 N.M. 545, 641 P.2d 1092, this Court was tasked with deciding when the plaintiff's disability began in order to apply Section 52-1-48, which at the time stated that benefits "shall be based on, and limited to, the benefits in effect on the date of the accidental injury resulting in disability or death." *Id.* ¶ 3 (internal quotation marks and citation omitted). According to *Lovato*, "[d]isability begins when a *compensable* injury manifests itself and wage-earning capacity is [affected]." *Id.* ¶ 5 (emphasis added). The *Lovato* court stated,

> "Plaintiff was able to work only three days out of the approximately five months following the accident, and only three and one-half weeks out of the approximately eight months following the accident. It is clear that a compensable injury manifested itself immediately following the accident and continued for a substantial period of time, and that plaintiff's wage-earning capacity had been [affected] since the date of the accident."

*Id.*; *see also Martinez v. Darby Constr. Co.*, 1989-NMSC-069, ¶ 12, 109 N.M. 146, 782 P.2d 904 ("A compensable injury requires some legal disability or inability to perform work[.]").

{27}     In *Montell v. Orndorff*, 1960-NMSC-063, 67 N.M. 156, 353 P.2d 680, our Supreme Court considered when a compensable injury occurred for purposes of determining whether an employee had given timely notice of a work-related injury to his or her employer. Our Supreme Court concluded that the Act "does not contemplate the payment of damages for accidental injuries, no matter how painful.

16

It is only *the disability or loss of earning power* which results from the injuries that calls for compensation. So when the [A]ct speaks of the occurrence of injury it refers to compensable injuries, and these occur when disability appears." *Id.* ¶ 10 (emphasis added) (internal quotation marks and citation omitted).

{28} Worker stopped working for Employer on December 21, 2012. She continued to receive her regular salary as sick leave benefits through March 31, 2013. Worker terminated her employment with Employer effective March 31, 2013 by retiring. Worker therefore stopped receiving her regular wage as of March 31, 2013, to which both Worker and Employer stipulated. Worker therefore was not eligible to be compensated by disability benefits under the Act until April 1, 2013. *See Rayburn v. Boys Super Mkt., Inc.*, 1964-NMSC-201, ¶¶ 7-9, 74 N.M. 712, 397 P.2d 953 (holding that the worker was not disabled and right to workers' compensation did not arise while worker remained employed and earning his regular wage); *Redhouse v. Pub. Serv. Co. of N.M.*, 1988-NMCA-034, ¶¶ 8, 12, 107 N.M. 389, 758 P.2d 803 (holding that employer's payment of sick leave negated obligation to pay workers' compensation benefits; workers are not "entitled to both paid accident leave and worker's compensation"); *De La Torre v. Kennecott Copper Corp.*, 1976-NMCA-108, ¶¶ 8-15, 89 N.M. 683, 556 P.2d 839 (holding that the obligation to pay workers' compensation benefits did not arise while the worker was paid sick leave). Further,

17

the WCJ concluded that Worker was entitled to TTD benefits from April 1, 2013 through January 15, 2014, an important determination Employer did not appeal and in fact agreed was binding upon the death benefits action.

{29} Worker was first entitled to compensation on April 1, 2013, and therefore knew or should have known that she had a compensable injury on April 1, 2013. The limitations period of Section 52-1-46 was therefore triggered on April 1, 2013, which was within two years of Worker's death on November 12, 2014. We therefore affirm the WCJ's conclusion that Section 52-1-46's limitations period was triggered on April 1, 2013.

## II. The WCJ Erred in Excluding the New Mexico Cancer Center Records and Dr. Richard Giudice's Testimony From the Death Benefits Trial

{30} As stated above, Section 52-1-46 authorizes payment of death benefits to a deceased worker's eligible dependents or other persons "if an accidental injury sustained by a worker proximately results in the worker's death[.]" Section 52-1-51(C) provides that, "[o]nly a health care provider who has treated the worker pursuant to Section 52-1-49 . . . or the health care provider providing the independent medical examination [(IME)] pursuant to this section may offer testimony at any workers' compensation hearing concerning the particular injury in question." Section 52-1-49 provides for selection of a health care provider to provide treatment for a worker's work-related injury. Only Drs. Liljestrand and Tolber had been selected to

18

treat Worker for her ABPA, and no health care provider had conducted an IME on Worker.

{31}	At the beginning of the November 12, 2015 death benefits trial, the WCJ addressed admission of exhibits. Claimant objected to Employer's proffer of Dr. Giudice's February 21, 2014 and September 14, 2015 depositions and the records of the New Mexico Cancer Center. Claimant argued that Section 52-1-51(C) limits testimony at any workers' compensation hearing about the particular work-related injury in question, whether it results in an injury or death, to authorized health care providers and providers who perform an IME. Employer argued that the statute was concerned with the injury and resulting disability, and that death and its proximate cause was a separate question not covered by it. The WCJ agreed with Claimant:

> I'm going to rule that the deposition testimony [and] records of Dr. Giudice will be excluded from this hearing as a result of [Section] 52-1-51(C) which indicates that only [a] health care provider [that] has treated Worker or provided an IME may offer testimony at a worker's comp hearing concerning particular injury in question. I think [that is the] case even though it deals with, . . . I guess, the cause of death of Worker still concerns the injury in question[.]

Later in the hearing Employer moved the WCJ to reconsider his ruling regarding the New Mexico Cancer Center records. The WCJ denied the motion: "I am obviously curious about what's in those records but I think given the fact—the wording of [Section 52-1-51(C)], I'm going to deny the request, . . . I've reconsidered it, and my

ruling remains the same." Thus, the record is clear that the WCJ's sole basis for excluding the evidence was his construction of Section 52-1-51(C).

**A.      Standard of Review**

{32}      "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard [when] the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *DeWitt*, 2009-NMSC-032, ¶ 13. "In reviewing a WCJ's interpretation of statutory requirements, we apply a de novo standard of review." *Id.* ¶ 14.

**B.      Principles of Statutory Construction**

{33}      "When interpreting statutes, [the courts'] responsibility is to search for and give effect to the intent of the [L]egislature. . . . Our understanding of legislative intent is based primarily on the language of the statute, and we will first consider and apply the plain meaning of such language." *Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶ 44, 121 N.M. 821, 918 P.2d 1321 (citation omitted). Courts apply the plain meaning rule to the Act. *See, e.g.*, *Chavez v. Mountain States Constructors*, 1996-NMSC-070, ¶ 23, 122 N.M. 579, 929 P.2d 971.

{34}      However, "[i]f the relevant statutory language is unclear, ambiguous, or reasonably subject to multiple interpretations, then [a court] should proceed with

further statutory analysis." *State v. Almanzar*, 2014-NMSC-001, ¶ 15, 316 P.3d 183; *accord*, *United Rentals Nw., Inc. v. Yearout Mech., Inc.*, 2010-NMSC-030, ¶ 16, 148 N.M. 426, 237 P.3d 728 ("Because we cannot definitively interpret the statute by a simple consideration of statutory language that is susceptible to more than one interpretation on its face, we must look to other guides of statutory interpretation."); *Citation Bingo, Ltd. v. Otten*, 1996-NMSC-003, ¶ 21, 121 N.M. 205, 910 P.2d 281 (stating where statutory language is ambiguous or otherwise not determinative, our Supreme Court will resort to principles of statutory construction).

{35} An important principle of statutory construction is to consider statutory context. We "look to other statutes in pari materia." *United Rentals Nw., Inc.*, 2010-NMSC-030, ¶ 22 (internal quotation marks and citation omitted). "We are to read the statute in its entirety and construe each part in connection with every other part to produce a harmonious whole." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 14, 121 N.M. 764, 918 P.2d 350; *accord, DeWitt*, 2009-NMSC-032, ¶ 14 (stating that provisions of the Act will be construed together to produce a harmonious whole). "We will construe the entire statute as a whole so that all the provisions will be considered in relation to one another." *N.M. Bd. of Veterinary Med. v. Riegger*, 2007-NMSC-044, ¶ 11, 142 N.M. 248, 164 P.3d 947 (internal quotation marks and citation omitted). "[W]hen expounding a statute, we must not be guided by a single sentence

21

or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Starko, Inc. v. N.M. Human Servs. Dep't*, 2014-NMSC-033, ¶ 35, 333 P.3d 947 (internal quotation marks and citation omitted).

{36}    Further, the plain meaning rule is not absolute. The rule "does not require a mechanical, literal interpretation of the statutory language. . . . If the strict wording of the law suggests an absurd result, we may interpret the statute to avoid such a result." *Cummings*, 1996-NMSC-035, ¶ 45 (citations omitted); *accord Sims v. Sims*, 1996-NMSC-078, ¶ 21, 122 N.M. 618, 930 P.2d 153 (stating that the plain meaning rule "does not require a wooden literal interpretation of all statutory language"). "We will avoid any literal interpretation that leads to an absurd or unreasonable result and threatens to convict the legislature of imbecility." *Chavez*, 1996-NMSC-070, ¶ 24 (internal quotation marks and citation omitted). Stated another way, "principles of statutory construction require that a statute be interpreted with logic and common sense to avoid an absurd result." *State v. Portillo*, 1990-NMSC-055, ¶ 10, 110 N.M. 135, 793 P.2d 265.

**C.    The WCJ Erred in Determining That Section 52-1-51(C) Barred Admission and Consideration of the Cancer Treatment Records and Deposition of Dr. Giudice in Determining the Cause of Worker's Death**

{37}    Section 52-1-51(C) provides that only a treating health care provider selected pursuant to Section 52-1-49 or a health care provider who has been designated

22

pursuant to the same statute to conduct an IME may testify "at any workers' compensation hearing concerning the particular injury in question." The question before us is whether Section 52-1-51(C) barred all health care providers other than Dr. Liljestrand and Dr. Tolber from testifying about the cause of Worker's death at the death benefits trial. The answer turns on the meaning of the phrase, "hearing concerning the particular injury in question." *Id.*

{38} It is not clear from the plain meaning of the words of Section 52-1-51(C) whether it applies to a Section 52-1-46 hearing. On the one hand, the subject of a Section 52-1-46 death benefits hearing can be characterized as the work-related injury, specifically, whether the death proximately resulted from it. This would suggest that Section 52-1-51(C)'s limitation on health care provider testimony extends to a death benefits hearing. On the other hand, the foregoing phrase can be read to imply negatively that there can be a workers' compensation hearing at which medical testimony is given where the subject is *not* the particular injury in question. The Legislature did not, for example, broadly provide that Section 52-1-51(C) is applicable to any workers' compensation hearing concerning a *medical issue*. Further, one can characterize the subject of a death benefits hearing as not "the particular injury in question," i.e., the work-related injury itself, but rather the cause of the death. This would suggest that Section 52-1-51(C)'s limitation on health care

23

provider testimony does not extend to a death benefits hearing. Because the applicability of the language of 52-1-51(C) to a Section 52-1-46 hearing is not clear, we turn to other bases of statutory construction.

**1.     Construction with other statutes**

{39}     Section 52-1-51(C) should be read in conjunction with Section 52-1-49, to which it refers, and the remainder of Section 52-1-51.

{40}     First, Section 52-1-49(A) imposes on a worker's employer the general obligation to provide reasonably necessary medical care to treat a work-related injury. The balance of Section 52-1-49 addresses the manner in which the health care provider who delivers that care is selected.

{41}     Section 52-1-49 suggests that Section 52-1-51(C) does not apply to a WCJ's cause of death determination pursuant to Section 52-1-46. The focus of Section 52-1-49 is solely on the delivery of care necessary to treat the work-related injury. One would not expect a health care provider who is selected to treat the work-related injury to necessarily also treat or even be aware of other medical conditions the worker may be experiencing. Thus, we cannot assume that Section 52-1-49 would be intended to identify health care providers who would be able to address in any knowledgeable and comprehensive manner contributing causes of a worker's subsequent death.

{42} APS could not possibly have selected Dr. Giudice as Worker's health care provider under Section 52-1-49 prior to her death, because he would not have been treating her work-related injury. And no health care provider could have been selected under Section 52-1-49 after Worker's death, because at that point the provider could no longer treat her. *Cf. Grine v. Peabody Nat. Res.*, 2006-NMSC-031, ¶¶ 25-26, 140 N.M. 30, 139 P.3d 190 (holding that the physician who briefly examined worker on one occasion did not qualify as an HCP selected under Section 52-1-49 and thus was not authorized to testify under Section 52-1-51(C)). This illustrates that under Claimant's construction, Section 52-1-49 is simply not available as a means of permitting an HCP who is treating a worker for a non-work-related medical condition to qualify to testify about causation at a death benefits hearing.

{43} Second, Section 52-1-51 articulates the method by which disagreements between the worker and the employer over medical issues are to be resolved. Section 52-1-51(A) allows the parties to either agree on a healthcare provider who will conduct an IME or petition the WCJ for appointment of a healthcare provider and have the worker undergo an IME. Section 52-1-51(B) describes how the workers' compensation judge shall choose the health care provider to conduct an IME. Section 52-1-51(E) provides that the worker "shall travel" to the place at which the IME shall be conducted and receive compensation for his or her travel expenses.

{44}    Under Section 52-1-51 independent medical examiners can be appointed only to address concerns relating to the provision of medical care or disability benefits—that is, matters arising while the worker is alive. Section 52-1-51(A) contemplates that the worker will "undergo" an IME, and Section 52-1-51(E) requires that the worker "shall travel" to the IME location. Further, all of the examples of disputed medical issues set forth in Section 52-1-51(A) concern the provision of care or benefits to living workers. *Cf. State v. Alverson*, 2013-NMCA-091, ¶ 11, 308 P.3d 1027 ("The rule of ejusdem generis requires that where general words follow an enumeration of persons or things of a particular and specific meaning, the general words are not construed in their widest extent but are instead construed as applying to persons or things of the same kind or class as those specifically mentioned." (alteration, internal quotation marks, and citation omitted)).

{45}    Like Section 52-1-49, these provisions suggest that Section 52-1-51(C) does not apply to a WCJ's cause of death determination pursuant to Section 52-1-46. We note as well for the same reasons that, under Claimant's construction of Section 52-1-51(C), a physician who performs an autopsy could not testify about the cause of death at a death benefits hearing: Section 52-1-51(C) specifically states that only a health care provider who performs an IME "pursuant to this section" may testify at a hearing. Indeed, in contrast to NMSA 1978, § 52-3-40 (1989), which authorizes

26

autopsies to determine the cause of death in the context of a claim for compensation filed under the New Mexico Occupational Disease Disablement Act, NMSA 1978, §§ 52-3-1 to -60 (1945, as amended through 2015), nowhere in the Act is a provision made for an autopsy.

{46}     The particular facts of this case highlight the evidentiary shortcomings that result from limiting testimony about the cause of death to those HCPs who have treated or otherwise addressed only a worker's work-related injury in accordance with Sections 52-1-49 and -51. It is undisputed that Worker was suffering from a recurrence of metastatic breast cancer starting in February 2012, which was within six months of when Worker was exposed to the aspergillus mold in her classroom that ultimately led to the diagnosis of ABPA. Dr. Giudice stated that individuals such as Worker who have metastatic breast cancer have an average life expectancy of two to five years from the time of their diagnosis. Dr. Liljestrand admitted that although he listed the causes of death on Worker's death certificate as pneumonia and chronic pneumonitis, he could not verify that he looked at a single medical record in making that determination. Dr. Liljestrand also could not verify that he relied on sources of information in determining Worker's cause of death other than a verbal recitation from Claimant. Similarly, Dr. Tolber's information about Worker's medical condition after September 2015 and the circumstances of her death was limited to his

conversation with Claimant. Dr. Liljestrand last saw Worker eight months before she died, and Dr. Tolber last saw Worker a month and a half before she died. In contrast, Dr. Giudice saw Worker the day before she died. Dr. Giudice's testimony and records concerning Worker's metastatic breast cancer thus would appear to be not only relevant but crucial in determining Worker's cause of death.

**2.      Avoiding an absurd construction**

{47}      Construing Section 52-1-51(C) to apply to a Section 52-1-46 death benefits hearing can lead to a practical absurdity. Assume a worker dies from a heart attack while at work. Because of the lack of any previous work-related injuries, there are no HCPs who had been selected under Section 52-1-49. Assume as well that the employer contests worker's survivor's death benefits claim that the death proximately resulted from an on-the-job accidental injury. In this situation, neither the worker nor the employer would be permitted to call any HCPs to testify about the cause of death. But because the worker's survivor would bear the burden of proving causation by expert medical testimony, *see Grine v. Peabody Natural Resources*, 2005-NMCA-075, ¶ 24, 137 N.M. 649, 114 P.3d 329, *rev'd on other grounds by* 2006-NMSC-031, the claim would be denied without any consideration of the evidence that medical professionals might be able to provide regarding the cause of death. *Cf. Mieras v. Dyncorp*, 1996-NMCA-095, 122 N.M. 401, 925 P.2d 518 (presenting factual scenario

28

that parallels this hypothetical; however, applicability of Section 52-1-51(C) to Section 52-1-46 death benefits hearing was not addressed).

{48} This case presents the equally problematic scenario in which at the time of her death, a worker is suffering from two serious medical conditions, only one of which is work-related. Such a scenario, even if not common, is hardly unique. We do not believe that the Legislature intended to limit the WCJ in any resulting Section 52-1-46 death benefits claim that the work-related condition caused the worker's death from hearing only the testimony of health care providers selected under Section 52-1-49 or 52-1-51, who by reason of their limited assignment may have only a partial and incomplete understanding of the entirety of the worker's medical circumstances. Conversely, we do not believe that the Legislature intended to bar the testimony of health care providers who were treating the worker immediately before her death and, as a result, could be expected to have the best understanding of the worker's overall condition and the cause or causes of death simply because they were treating a non-work-related condition. We will not assume that the Legislature would mandate that the WCJ should have only a one-sided or otherwise limited picture of the worker's health at the time of her death.

{49} This hypothetical example and the facts of this case illustrate the fundamental problem with limiting testimony about the cause of death to health care professionals

who are either selected pursuant to Section 52-1-49 or appointed to conduct IMEs: there is a disconnect between the work-related injury issues—all arising while the worker is alive—that those professionals are addressing, and the cause of death issue that is the focus of Section 52-1-46. It is precisely because Section 52-1-49's and Section 52-1-51's provisions for selection of HCPs and IME examiners, respectively, are confined to the treatment and assessment of work-related injuries that it is absurd to identify them as the exclusive universe of witnesses who can testify about the cause or causes of a worker's death.

**3.     Case law precedent**

{50}     New Mexico case law precedent does not require a contrary construction of Section 52-1-51(C), because no case has addressed the statute's applicability to testimony about the cause of death in a Section 52-1-46 proceeding.

{51}     In *Grine*, a worker suffered a heart attack in October 2000 while at work and died in June 2002. 2006-NMSC-031, ¶ 1. He had pursued a claim for workers' compensation disability benefits, and after his death his widow was substituted as plaintiff to continue that claim as well as assert a claim for death benefits. *Id.* There apparently was no dispute that his death was attributable to the heart attack, but the employer vigorously disputed that the underlying heart attack occurred because of his job. *Id.* ¶¶ 12-15; *see* §§ 52-1-9(C), -28(A). Our Supreme Court concluded that the

doctor whom the employer had engaged to examine the worker prior to his death, and who later testified about whether the heart attack was caused by employment conditions, did not qualify under Section 52-1-49 as a selected HCP because he never actually treated the work-related injury. Therefore, the doctor's testimony on that issue was inadmissible pursuant to Section 52-1-51(C). *Grine*, 2006-NMSC-031, ¶¶ 23-25. Further, this issue arose not in the context of whether under Section 52-1-46 the death proximately resulted from the initial heart attack, but rather whether under Section 52-1-28(B) it could be established that the heart attack was an accidental injury arising out of, and in the course of, the worker's employment. *Grine*, 2006-NMSC-031, ¶ 29. Thus, *Grine* provides no guidance on the issue that we address herein.

{52}     The reasoning in *DeWitt* in some respects tracks our analysis here. *DeWitt* addressed the selection of a health care provider under Section 52-1-49 and the admissibility of that person's testimony under Section 52-1-51(C), but not in the context of a death. *DeWitt*, 2009-NMSC-032, ¶ 8. A worker with a pre-existing back condition experienced back pain following an accident at work. *Id.* ¶ 2. She underwent surgery and later filed a claim for workers' compensation benefits. *Id.* ¶¶ 4-5. The worker then selected, as her health care providers under Section 52-1-49, the doctors who previously had treated her and performed the surgery. *DeWitt*, 2009-

NMSC-032, ¶ 5. At trial on her claim for disability benefits, the WCJ excluded those doctors' testimony (which the worker proffered) on the theory that Section 52-1-51(C) did not permit testimony that was based on treatment provided before the date on which the doctors became HCPs for workers' compensation purposes. *DeWitt*, 2009-NMSC-032, ¶ 8. Our Supreme Court rejected this reasoning. The Court noted that related statutes must be read together, *id.* ¶ 30, and that the construction given by the WCJ to Section 52-1-51(C) acted absurdly as an impediment to the selection of health care practitioners pursuant to Section 52-1-49, because they could not be called upon to testify about their care, treatment, and examinations of workers before and after their selection. *DeWitt*, 2009-NMSC-032, ¶ 31. Our Supreme Court observed as well that:

> Employer's construction would preclude the ability of an HCP, who had treated a worker before the relevant work-related injury, from testifying about the worker's complete medical history. This would inhibit a full analysis of the causation issues that may be so critically important in these cases. In effectuating the intent of the Legislature, we must avoid any interpretations that would lead to absurd or unreasonable results.

*Id.* This language in *DeWitt* indirectly supports a construction of Section 52-1-51(C) that permits a WCJ to consider all the relevant evidence regarding the cause of a worker's death.

{53}     We recognize that in these decisions our Supreme Court concluded that in enacting Section 52-1-51, "the Legislature intended to limit the use and number of

32

experts in workers' compensation cases," *Grine*, 2006-NMSC-031, ¶ 19, and that it was "the obvious intent of the Legislature [in enacting Section 52-1-51] to avoid testimony-shopping[.]" *DeWitt*, 2009-NMSC-032, ¶ 35. However, construing the statute in the manner advocated by Claimant here would not advance the apparent underlying legislative purpose of minimizing the cost of treating the worker's work-related injury, *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 28, 134 N.M. 421, 77 P.3d 1014, and instead would serve only to bar the WCJ's consideration of potentially highly relevant information in arriving at a correct decision about the truth of what caused a worker's death. We observe as well that Employer's proffer of Dr. Giudice as a causation witness in any event can hardly be criticized as testimony-shopping: at the time of Worker's death he had been her treating doctor (albeit for her cancer as opposed to her ABPA) since 2009.

**4.    Summary**

{54}    For these reasons, we conclude that Section 52-1-51(C) does not limit expert testimony regarding the circumstances and cause of a worker's death in connection with a claim for death benefits under Section 52-1-46 to that given by an HCP who has provided care for a worker's work-related injury pursuant to Section 52-1-49, or an independent medical examiner identified pursuant to Section 52-1-51(A). We therefore reverse the WCJ's rulings based on Section 52-1-51(C) that Dr. Giudice's

33

depositions and the records of the New Mexico Cancer Center were inadmissible and the medical evidence of cause of death was uncontradicted, and the WCJ's determination regarding the cause of Worker's death. We also remand this case for retrial of the issue of whether, in the words of Section 52-1-46, Worker's ABPA "proximately result[ed]" in her death. This Court's ruling is made solely on the basis of the WCJ's erroneous statutory analysis. We have not considered, and do not presume to suggest, whether Worker would have a basis for objecting to the admission of this evidence on other grounds or what causation decision the WCJ ultimately might make following consideration of all admitted evidence. On the contrary, resolution of those issues remain for retrial.

**III. The WCJ Erred in Determining the Amount of Death Benefits Awarded to Claimant**

{55}    In addition to compensation for medical expenses prior to death, funeral expenses, and attorney's fees, Section 52-1-46 provides for a basic weekly death benefit that tracks a worker's disability benefit. In particular, where the worker is survived by a widow or widower but no minor children, Section 52-1-46(C)(2) provides the widow or widower with a weekly death benefit of "sixty-six and two-thirds percent of the average weekly wage of the deceased[.]" This benefit is to be paid for 700 weeks, Section 52-1-41(D), or until remarriage, Section 52-1-46(C)(2), whichever comes first. Section 52-1-47(A) establishes a cap of 700 weeks of benefits

"for any combination of disabilities . . . or any combination of disability [or] death[,]" which means that if an employer has paid disability benefits to a worker prior to the worker's death, the 700 weeks of death benefits will be reduced by the number of weeks of disability benefits that previously had been paid.

{56} In addition to awarding Claimant compensation for Worker's last medical expenses, funeral expenses, and attorney's fees, the WCJ awarded death benefits in the amount of 99% of two-thirds of Worker's average weekly wage for 700 weeks, subject to a credit for the number of weeks of PPD that Employer had paid to Worker prior to her death.

{57} Employer contends that, if Claimant were entitled to any weekly death benefits at all, the benefits were limited to those that had accrued prior to Worker's death. As we understand it, Employer's argument is based on a joint reading of Sections 52-1-46(G) and 52-1-47(C). Section 52-1-46(G) provides that "no compensation benefits payable by reason of a worker's death shall exceed the maximum weekly compensation benefits as provided in Section[] . . . 52-1-47." Section 52-1-47(C) provides that "in no case shall compensation benefits for disability continue after the disability ends or after the death of the injured worker[.]" Employer urges that, because disability benefits end upon the death of the worker, Section 52-1-46(G) must mean that death benefits, which Employer characterizes as "unaccrued," also

35

must end upon death. *See Holliday v. Talk of the Town, Inc.*, 1985-NMCA-024, ¶ 5, 102 N.M. 540, 697 P.2d 959 (noting that "awarded but unaccrued benefits for disability terminate upon death").

{58}     If accepted, Employer's argument would nullify Section 52-1-46's provision of weekly death benefits. The relevant statutory language does not support Employer's argument. Employer is conflating the maximum weekly amount of the *death* benefit (Section 52-1-46(G)) with the provision that the death of the worker ends *disability* benefits (Section 52-1-47(C)). That is, Section 52-1-46(G) limits the maximum weekly death benefit amounts to those payable pursuant to Sections 52-1-41 to -43, and -47, which generally is two-thirds of the worker's average weekly wage. While Section 52-1-47(C) provides that disability benefits end upon death, Sections 52-1-41(D), -43(B), and -47(B) make clear that death benefits are payable upon death even if disability benefits previously had been paid, up to a maximum of 700 weeks of combined disability and death benefits.

{59}     In his cross-appeal, Claimant argues that the WCJ erred in awarding weekly death benefits in the amount of 99%, as opposed to 100%, of two-thirds of Worker's average weekly wage. We agree with Claimant. It appears that the WCJ determined that the death benefit should equal the amount of Workers' PPD benefit. In doing so, the WCJ erred. Section 52-1-46(C)(2) provides without qualification for a weekly

36

death benefit to a widow or widower in the amount of sixty-six and two-thirds percent of the worker's average weekly wage. The amount of the benefit does not vary based upon whether the worker, prior to death, was totally or partially permanently disabled. This is logical, given that death can be viewed as entirely terminating a worker's wage-earning capacity, and therefore a death benefit should be the same as a total disability benefit.

**CONCLUSION**

{60}    We affirm the WCJ's conclusion that Worker's death occurred within two years of her compensable injury. We reverse the WCJ's exclusion of Dr. Giudice's deposition testimony and the medical records of the New Mexico Cancer Center from the death benefits trial. We also reverse the WCJ's resulting conclusion that the medical evidence concerning Worker's cause of death was uncontradicted. We emphasize that we are remanding to the WCJ for retrial on the causation element of Claimant's death benefit claim. Last, we reverse the WCJ's calculation of weekly death benefits to which Claimant would be entitled assuming Claimant prevails on the causation issue. Only if the WCJ determines that Worker's ABPA "proximately resulted" in her death will it be necessary for the WCJ to recalculate the amount of the weekly death benefit. We vacate the April 21, 2016 compensation order and remand the case for retrial and for further findings consistent with this opinion.

{61}     **IT IS SO ORDERED.**

_____
**HENRY M. BOHNHOFF, Judge**

**WE CONCUR:**

_____
**M. MONICA ZAMORA, Judge**

_____
**STEPHEN G. FRENCH, Judge**